# In the United States Court of Federal Claims

No. 14-1076C
(Filed Under Seal: February 5, 2015)
(Reissued for Publication: February 27, 2015)<sup>*</sup>

| | | |
|---|---|---|
| ************************************* | | Bid Protest; Motion to Dismiss; Cross-|
| NORTHEAST CONSTRUCTION, INC., | * | Motions for Judgment on the Administrative |
| | * | Record; One Technically Acceptable |
| Plaintiff, | * | Proposal; Solicitation Amendment Issued to |
| | * | Offerors Previously Excluded From the |
| v. | * | Competition; Challenge to Terms of |
| | * | Solicitation Amendment; Waiver; <u>Blue &</u> |
| THE UNITED STATES, | * | <u>Gold Fleet</u>; <u>COMINT Systems</u>; Existence |
| | * | of an Enforceable Contract; Contract |
| Defendant. | * | Required to Be in Writing |
| ************************************* | | |

<u>Jerry Alfonso Miles</u>, Rockville, MD, for plaintiff.

<u>Jeffrey M. Lowry</u>, United States Department of Justice, Washington, DC, for defendant.

## OPINION AND ORDER

**SWEENEY**, Judge

In this bid protest, plaintiff Northeast Construction, Inc. asserts that the procuring agency improperly cancelled the contract it awarded to plaintiff, and alternatively that the procuring agency improperly amended the solicitation and reopened the competition. Defendant moves for the dismissal of the latter claim, arguing that plaintiff waived that claim by failing to raise it in a timely manner. Additionally, the parties cross-move for judgment on the administrative record with respect to both claims. As explained in more detail below, plaintiff waived its claim regarding the amendment of the solicitation, and has not established that it had an enforceable contract with the government. Consequently, the court grants defendant's motion to dismiss and, with respect to plaintiff's remaining claim, grants defendant's motion for judgment on the administrative record.

## I. BACKGROUND

### A. The Solicitation

---

<sup>*</sup> This reissued Opinion and Order incorporates the agreed-to redactions proposed by the parties on February 13, 2015. The redactions are indicated with bracketed ellipses ("[. . .]").

On April 22, 2013, the Garrison Contracting Division of the United States Army Contracting Command–Aberdeen Proving Ground ("Army") issued solicitation W91ZLK012-R-0007-0006 for the repair and maintenance of roofing systems throughout the Aberdeen Proving Ground.[1]  AR 82.  The Army contemplated awarding a firm-fixed-price requirements contract with an initial term of one year and four one-year option periods.  Id.  It expected, as reflected in its source selection plan, that the source selection process would be brief–lasting just under two-and-one-half months.  Id. at 942.

Pursuant to the solicitation–as amended through June 25, 2013–offerors were to submit their proposals in two binders:  one that contained a technical proposal and past performance information, and another that contained a price proposal.  Id. at 106.  The technical proposal was to include evidence of the offeror's bonding capacity; a discussion of the offeror's quality control, health and safety, and environmental control plans; and a discussion of the offeror's plan for contract management.  Id. at 108-10.

The Army intended to award a contract to the offeror with the lowest-price, technically acceptable proposal.  Id. at 122.  To accomplish this goal, the Army would evaluate the offerors' proposals on three factors:  Technical, Past Performance, and Price.  Id. at 112.  The Technical factor was further divided into five subfactors:  Bonding Capacity, Quality Control Plan, Health and Safety Plan, Environmental Plan, and Contract Management Plan.  Id.  The Army would first evaluate the offerors' proposals for technical acceptability; a technically unacceptable proposal would "be eliminated from further consideration for award."  Id.  A proposal would be considered technically acceptable if the offeror "address[ed] all elements of the subfactors."  Id. at 113.  The Army warned that "[f]ailure to address all elements of the subfactors or failure to provide any required document [would] render the offeror technically unacceptable for that element," and that one unacceptable rating would render the entire proposal technically unacceptable.  Id.; accord id. at 123.  Moreover, the Army reserved the right to "reject any or all proposals if such action was in [its] best interest."  Id. at 126.

The Army indicated how it would evaluate each proposal by describing the elements of each factor and subfactor that it expected the offerors to address.  Id. at 113-22.  Of the Technical subfactors, two are of particular importance in this protest:  Quality Control Plan, and Health and Safety Plan.  To be deemed technically acceptable under the Quality Control Plan subfactor, the Army required the following:

> Provide a discussion of planned Quality Control (QC) activities to meet the requirements of the contract.  This discussion should be broad enough to address all aspects of QC including[,] as a minimum, responsibility for surveillance of work, acceptance, rejection, documentation and resolution of deficiencies, trends analysis, corrective actions, QC processes and interface with Government inspector and contract closeout procedures.

[1]  The court derives the facts from the administrative record ("AR").

The Offeror shall provide written documentation that the corporate Quality Control Plan has been written, reviewed and/or administered by a Registered Roof Consultant (RRC) who is either on staff or retained as a consultant to the offeror.

The offeror shall appoint a Quality Control (QC) manager in writing.

. . . .

The offeror's plan shall describe control procedures of non-compliance for preventing problems, minimizing the reoccurrence and ensuring deficiencies are corrected.  Identify who is responsible and has the authority for identifying, stopping work from continuing, documenting, recording, directing replacement of corrections and ensuring resolution.

The offeror shall describe the process for the identification, documentation and timely correction of punch list items as well as the final inspection and government acceptance of work.

. . . .

The Quality Control (QC) Plan shall include the following:

    (a) The offeror shall provide the number [of] years of experience and types of licenses as well as documentation that the qualifications for the Quality Control (QCM) Manager and Quality Control Inspectors (QCI's) meet or exceed the requirements of the specifications.

    . . . .

    (c) The offeror shall identify in their proposal the name of the inspection company that will perform the eight month [Infrared] Inspection of the new roof systems installed on post as a result of any subsequent award.

    (d) The offeror shall be able to provide a No-Dollar-Limit Warranty on applicable roofing systems.  The offeror shall provide a statement from the roofing system manufacturer(s) they intend to use attesting that the offeror can meet this requirement.

Id. at 113-14.  And, to be deemed technically acceptable under the Health and Safety Plan subfactor, the Army required the following:

Discuss overall health and safety program, including training and documentation. Demonstrate familiarity with and adherence to the standard Occupational Safety

and Health Administration (OSHA) safety requirements for all proposals. Describe steps taken that promoted safety during contract performance within the last three (3) years.

The offeror shall provide written documentation of a worker's compensation insurance Experience Modification Rate (EMR) of less than 1.00 for the previous five-year operating period.  . . .

The offeror shall provide records of OSHA recordable injuries/illnesses reports for the previous five (5) years included.  . . .

Provide documentation that the offeror has a Certified Safety Professional (CSP) on staff or has retained the services of a CSP for the life of the contract to administer the Corporation[']s Health and Safety Plan programs.

The offeror shall provide resumes for the Certified Safety Professional detailing the years of experience and licenses.  These individuals must have a minimum of five (5) years experience in the oversight of construction related safety programs and be fluent in English.  Identify the years of experience specific to roofing projects.

The offeror shall provide a written health and safety plan . . . .  The plan shall be prepared by and signed by the Certified Safety professional and signed by the officers of the Corporation.

The Health and Safety Plan shall include the following:

(a) Provide detailed control procedures for non-compliance [with] safety and health requirements:  identify who is responsible and has the authority for identifying, stopping work, implementing corrections, documenting, recording and ensuring resolutions.

(b) Provide a detailed explanation of how the plan provides for ensuring the material condition of equipment to be used on this [sic] safety switches, safety overrides and visual/audible warning devices are intact and operational to include corporately owned and rented equipment.

(c) Provide company drug and alcohol policies to include prevention programs as well as actions to be followed for employees with substance abuse issues.

Id. at 114-15.  With respect to the Past Performance factor, the Army intended to evaluate the relevancy of the offerors' past performance, the recency of the offerors' past performance, and

the responses to past performance questionnaires, ultimately rating the past performance as acceptable or unacceptable. Id. at 120-21. Finally, the Army provided that it would evaluate the offerors' proposed prices using the price analysis techniques described in Federal Acquisition Regulation ("FAR") 15.404-1(b);[2] an offered price was required to be reasonable and balanced. Id. at 122.

## B. Proposals

The Army received [. . .] proposals in response to the solicitation by the July 10, 2013 due date. Id. at 82, 972. The proposals were submitted by plaintiff; [. . .]. Id. at 972. From August 19 to August 23, 2013, a Source Selection Evaluation Board ("SSEB") reviewed the proposals and determined that only one proposal–the one submitted by plaintiff–was technically acceptable. Id. With respect to the remaining proposals, the SSEB identified the following deficiencies:[3]

[. . .] [4]

[. . .]

See id. at 983-95, 1096-98 (footnote added). Pursuant to the terms of the solicitation, these deficiencies rendered the proposals technically unacceptable. Id. at 113, 123.

Although the SSEB reviewed the submitted proposals in August 2013, id. at 972, and the source selection plan reflected that the Army expected to award the contract one month after the SSEB evaluated the proposals, id. at 942, it was not until seven months later that the [. . .] offerors with technically unacceptable proposals were notified of that fact, id. at 983-95, 1096. In preaward-notice-of-exclusion letters dated March 25 and 26, 2014, the contracting officer, Kimmie I. Edwards, advised those offerors that they had been eliminated from the competition and would no longer be considered for contract award. Id. In each letter, Ms. Edwards described the deficiencies identified by the SSEB. Id.

## C. Negotiations With Plaintiff

In the meantime, after the SSEB determined that plaintiff had submitted the only technically acceptable proposal, the Past Performance Evaluation Team reviewed plaintiff's past

---

[2] Unless otherwise stated, citations to the FAR are to those provisions in effect when the Army issued the solicitation at issue in this protest.

[3] The information that follows is derived from multiple sources in the administrative record. See AR 983-95, 1096-98. The recitation for each offeror contains quotations from these sources, lightly edited for clarity and consistency.

[4] [. . .]

performance information.  Id. at 967-71.  In a January 24, 2014 report, the team concluded that plaintiff's past performance was acceptable, with [. . .].  Id. at 967, 971.  Thus, the Army was satisfied with plaintiff's technical proposal and past performance.

However, the Army was dissatisfied with the price offered by plaintiff.  The Army's initial estimated cost for the contract–for the base year and the four option years–was [. . .].[5]  Id. at 78.  In contrast, plaintiff's proposed price was [. . .].  Id. at 923.  In light of this difference, the Army invited plaintiff to negotiate its price.  Id. at 1001.  A conference call was convened on March 26, 2014; participants included Woo K. (David) Cheon (President), Scott Lee (Vice President), and Hae Hong (Preconstruction Manager) for plaintiff; and Ms. Edwards, Renae I. McHenry (Contract Specialist), Marian J. Friedman (Contract Specialist), and Bruce Erdner (Project Manager) for the Army.  Id. at 997, 999-1000.  During the conference call, Ms. Edwards offered to award the contract to plaintiff for [. . .].  Id. at 997.  Plaintiff requested time to evaluate the offer, and the parties agreed to reconvene in person the following day "to finalize pricing arrangements."  Id.

The meeting occurred as scheduled on March 27, 2014.  Plaintiff was represented by Mr. Cheon, Mr. Lee, and two other individuals, while the Army continued to be represented by Ms. Edwards, Ms. McHenry, Ms. Friedman, and Mr. Erdner.  Id.  The parties exchanged a number of counteroffers, with plaintiff ultimately presenting an offer of [. . .].  Id.  Ms. Edwards accepted this offer.  Id.  Accordingly, on April 2, 2014, plaintiff provided the Army with a revised price proposal reflecting the negotiated contract price.  Id. at 998.

### D.  Responses From Excluded Offerors

While the Army was engaged in price negotiations with plaintiff, one of the offerors with a technically unacceptable proposal, [. . .], responded to the preaward-notice-of-exclusion letter that it received.  Id. at 1096.  In a March 28, 2014 letter, [. . .] disputed the deficiencies identified by the Army and explained where in its proposal the Army could locate the allegedly missing information.  Id. at 1096-98.  The Army did not immediately respond to [. . .]'s letter.

A second offeror with a technically unacceptable proposal, [. . .], lodged a protest with Ms. Edwards on April 7, 2014.  Id. at 1080.  Like [. . .], [. . .] disputed the [. . .] identified by the Army and explained where in its proposal the Army could locate the allegedly missing information.  Id. at 1080-86.  In a May 6, 2014 letter, Lieutenant Colonel Derek J. Draper, Chief of the Garrison Contracting Division, agreed with [. . .]'s contention that [. . .] provided the required insurance information.  Id. at 1087, 1091.  However, he disagreed with the contention that [. . .] met the solicitation's requirements regarding the use of a Certified Safety Professional.  Id. 1088-91.  Accordingly, he denied [. . .]'s protest.  Id. at 1091.

_____

[5]  The government cost estimate included in the administrative record is undated, see AR 1-78; presumably it was prepared prior to April 22, 2013, when the solicitation was issued.

Almost one month later, the Army responded to [. . .]'s March 28, 2014 letter.  Id. at 1096.  In a June 4, 2014 letter, a new contracting officer, Major Michelle Lewis, agreed that [. . .]'s proposal should not have been deemed technically unacceptable based on [. . .] deficiencies identified by the Army.  Id. at 1096-98.  However, she concluded that the Army correctly noted that [. . .] did not provide [. . .].  Id. at 1096-97.  [. . .] responded to Major Lewis's letter on June 10, 2014, expressing its continued disagreement with the Army's deficiency findings.  Id. at 1099.

### E.  Further Communications With Plaintiff

While the Army was entertaining the objections raised by [. . .], it continued to communicate with plaintiff regarding contract award.  In a June 5, 2014 electronic-mail message, plaintiff asked Ms. McHenry, presumably based on information previously provided, whether it could expect the contract award the following day.  Id. at 1094.  Ms. McHenry responded that the Army needed ten days to answer plaintiff's question.  Id.  Plaintiff followed up on June 20, 2014, asking Ms. McHenry when the contract would be awarded.  Id. at 1093.  Ms. McHenry forwarded plaintiff's inquiry to Major Lewis, who responded to plaintiff that same day, as follows:  "[I]n light of the issues raised during the protest and debriefings, the Government has decided to amend/revise the requirement and re-solicit.  Once the amended solicitation is ready, your company will be invited to provide a revised proposal."  Id. at 1092.

### F.  Plaintiff's Protest at the Government Accountability Office

In response to the information provided by Ms. Lewis, plaintiff lodged a protest at the Government Accountability Office ("GAO") on June 30, 2014, challenging the Army's "cancellation" of the solicitation.[6]  Id. at 1100.  Plaintiff argued that it was unreasonable for the Army "to cancel the solicitation after receipt of solicitation responses, review and evaluation of said responses, negotiations, and determining an apparent awardee," and requested that the GAO recommend that the Army continue with its award of the contract to plaintiff.  Id.; see also id. at 1103-04 (containing plaintiff's contention that the Army cancelled the contract award).  The Army responded by advising the GAO that "the solicitation has not been canceled, nor has a contract award been made under the solicitation.  Rather, the Army intends to issue an amendment to the current solicitation to revise the ambiguous evaluation criteria and then invite new proposals under the revised solicitation."  Id. at 1105.  In support of these assertions, the Army submitted a declaration from Major Lewis, who stated:

(4)  Offerors whose proposals were rejected were provided, when requested, a

---

[6]  In its protest letter, plaintiff indicates that it learned that the Army intended to cancel the solicitation during a June 20, 2014 conference call, and that the Army confirmed its intent to cancel the solicitation and reissue it at a later date in a June 24, 2014 electronic-mail message. AR 1101.  There is no contemporaneous evidence of a June 20, 2014 conference call or a June 24, 2014 electronic-mail message in the administrative record.

debriefing.  In addition, a contracting officer-level protest was filed by an offeror who was determined to be technically unacceptable.  At this stage, the Army became aware of material ambiguities in the solicitation's evaluation criteria, which is [why] the Army is preparing an amendment to the solicitation, [under which] all offerors will have an opportunity to submit a new proposal.

(5)  The Army never made a formal award selection, although it appears the prior Procuring Contracting Officer improperly advised Northeast Construction that it was the likely awardee.

(6)  On June 20, 2014, Mr. Scott Lee, representative from Northeast Construction Inc., called me in reference to an email . . . in which I stated that I had decided to amend the solicitation and seek revised proposals.

(8) [sic]  I informed Mr. Lee that the Army was not cancelling the solicitation or the requirement, but instead was revising the solicitation, and that the amendment would issue in the near term.

(9) [sic]  Mr. Lee expressed concerns as he and members of his company were given a verbal confirmation from the previous Procuring Contracting Officer that Northeast Construction, Inc. was the anticipated awardee.  However, I told him that there were ambiguities within the evaluation criteria, and that, as such, the Army decided to revise the evaluation criteria, and permit all offerors to propose in accordance with the revised solicitation.

Id. at 1107.  The Army therefore requested that the GAO summarily dismiss plaintiff's protest.  Id. at 1105-06.

In a July 11, 2014 letter, plaintiff opposed the Army's request for summary dismissal.  Id. at 1108-12.  It argued that the Army did, in fact, award it the contract.  Id. at 1108.  But even if there was no contract award, plaintiff continued, the Army's decision to amend the solicitation to correct allegedly ambiguous evaluation criteria was arbitrary and capricious.  Id.; accord id. at 1110 ("[T]he Agency offered absolutely no explanation as to its reasons . . . for amendment of the Solicitation . . . ."), 1111 ("[T]he Agency should be required to evaluate and provide an accepted reason for . . . amendment . . . .  If the GAO finds that the Agency . . . is amending the Solicitation, we still contend that summary dismissal is unwarranted.  [U]nder [FAR] 15.206, the government may amend a solicitation when it 'changes its requirements or terms and conditions', but there has been no such showing in this case.").  The GAO, however, concluded that the absence of an awarded contract or a cancelled solicitation rendered plaintiff's protest academic.  Id. at 1113.  Accordingly, it dismissed plaintiff's protest on July 14, 2014.  Id.  Plaintiff sought reconsideration on July 24, 2014, id. at 1114-19, a request that the GAO denied on September 25, 2014, id. at 1120-21.

### G. Further Amendments of the Solicitation

On October 22, 2014, the Army issued Amendment 7 to the solicitation, describing the amendment as follows: "Revision to the Scope of Work and the evaluation criteria." Id. at 650. The extent to which the Army revised the Scope of Work is unclear; neither a revised Scope of Work nor a description of the revisions to the Scope of Work was included in the administrative record.[7]  However, the administrative record reflects that the Army substantially changed the evaluation criteria. Id. at 658-65.

With respect to the process by which it would evaluate proposals, the Army decided not to evaluate all of the proposals for technical acceptability and then, from the pool of technically acceptable proposals, award the contract to the offeror that proposed the lowest price. Instead, the Army provided that it would first rank all of the proposals by price and then:

> evaluate the lowest offeror's technical proposal. If the proposal is determined to be technically unacceptable, it will be eliminated from further consideration for award. The Government will then go to the next low offeror in the same manner. This process will continue until an offeror is found to be technically acceptable in ascending order of the low price. Once a proposal is determined to be technically acceptable, past performance will be evaluated. If the past performance is deemed unacceptable, the next lowest technically acceptable proposal will be evaluated for acceptability. This process will continue until an offeror is found to be technically acceptable with acceptable past performance.[8]

Id. at 658 (footnote added). Left unaltered from the initial evaluation procedures were the warnings that "[f]ailure to address all elements of the subfactors or failure to provide any

---

[7]  The Scope of Work was included with the solicitation as an attachment, AR 104, 174, which was titled "Post-Wide Roofing Requirements Statement of Work and Contract Specification," id. at 185. Only the original Scope of Work attachment is included in the administrative record. Id. at 185-429.

[8]  Given the same set of proposals and the same evaluation criteria, the result of the two different evaluation processes would be the same. The original process required the Army to identify the technically acceptable proposals, and then, from that group, select for award the offeror that proposed the lowest price. The amended process required the Army to identify the offeror that proposed the lowest price, but prohibited the Army from awarding the contract to that offeror if the proposal was not technically acceptable. Under either process, the Army was required to award the contract to the offeror who submitted the lowest-price, technically acceptable proposal. Indeed, if the Army used the amended process to evaluate the originally submitted proposals under the original evaluation criteria, plaintiff would have been the successful offeror because even though it may not have proposed the lowest price, the offerors who proposed lower prices would have been excluded as technically unacceptable.

required document [would] render the offeror technically unacceptable for that element," and that one unacceptable rating would render the entire proposal technically unacceptable.  Id. at 659.

In addition to changing its evaluation process, the Army amended its criteria for evaluating the Technical subfactors.  Id. at 659-60.  For example, it expanded the criteria for evaluating the Quality Control Plan subfactor as follows:

> Provide a discussion of planned Quality Control (QC) activities to meet the requirements as outlined in the specification sections 01-01-01, General Conditions, and 01-45-00.10-20[,] Quality Control.  Quality control is defined as the plans, procedures and organization necessary to produce an end product which complies with the requirements set forth in this solicitation and subsequent contract documents and specifications.  A Quality Control Plan is defined as a compilation of the means and methods to be employed by an organization to ensure their work practices, materials acquisition, logistics support and management controls are in place and functioning to provide an end product that meets the requirements outlined within the contract documents and specifications.  This discussion should be broad enough to address all aspects of QC including[,] as a minimum, responsibility for surveillance of work, acceptance, rejection, documentation and resolution of deficiencies, trends analysis, corrective actions, QC processes and interface with Government inspector and contract closeout procedures.

> The Offeror shall provide written documentation that the corporate Quality Control Plan has been written or reviewed by a Registered Roof Consultant (RRC) who is either on staff or retained as a consultant to the offeror.  The RRC shall sign and date the offeror's QC Plan indicating their specific role in the development and/or review of the plan.  Their signature shall attest that the Quality Control Plan meets the minimum requirements of Section 01-45-00.10-20, Quality Control and accepted roofing industry standard[s].

> The RRC shall be certified by the Roofing Consulting Institute (RCI) that said individual meets the standards set forth by the RCI for knowledge, experience and ethical practices required.  The RRC shall have a minimum of five (5) years experience as a Registered Roof Consultant.  The experience resume and credentials of the Registered Roof Consultant (RRC) shall be submitted with the Quality Control Plan as an attachment.

> The offeror shall retain the services of a Registered Roof Observer (RRO) who has been certified by the Roofing Consulting Institute (RCI) that said individual meets the requirements set forth by that organization for experience, knowledge and ethical practices for the purpose of installation monitoring and documentation of roofing projects issued during the course of the contract award period.  The

RRO shall be an integral part of the Quality Control program and shall function as the Quality Control Manager (QCM) for the offeror.

The offeror shall provide a detailed experience resume of the RRO documenting a minimum of three (3) years experience as a Registered Roof Observer.  The offeror shall provide the experience resume and credentials of the Registered Roof Observer (RRO) they have retained as an attachment to the offeror's Quality Control Plan[.]

The appointment of the Quality Control Manager (QCM) by the offeror shall be in writing.  This appointment shall be on the offeror's corporate letterhead and shall clearly delineate the authorities, the duties and the responsibilities as well as the reporting requirements for the position of Quality Control Manager respective of the offeror[']s operations at Aberdeen Proving Ground.  This appointment letter shall be signed by the president or chief operating officer of the offeror's organization.

The offeror shall insure that Quality Control Manager (QCM) and any Quality Control Inspectors (QCI's) shall not be assigned to any duties or responsibilities that would prevent or preclude them from focusing upon their primary responsibility for Quality Control.  . . .

The offeror's plan shall describe control procedures of non-compliance for preventing problems, minimizing the reoccurrence and ensuring deficiencies are corrected.  At a minimum, the plan shall clearly answer the following questions: Who is responsible for the identification of problems relating to non-compliance [with] the specifications, installation methods and work practices?  How is this communicated and documented up the chain of command to local management and to the corporate level?  Who has authority to issue a stop work order with regard to non-compliant materials, work practices, [and] installation methods? Who is responsible for the documentation of the issue, the steps taken to correct the issue and methods to be employed to prevent a reoccurrence of the issue?  The plan shall spell out in detail the company procedures to address these questions.

The offeror shall describe the means and methods for the identification, documentation and timely correction of punch list items as well as the final inspection and government acceptance of work.  At a minimum the plan shall address who is responsible for notification that the installation is ready for inspection, [and] who performs the inspection and documents the results[.]  Who is responsible for the correction of all documented deficient items?  How are additional deficiencies not captured by the initial inspection to be addressed? What procedures must be satisfied before the government's final acceptance inspection and [what are] the procedures for correction of deficiencies found

during the Government inspection?

. . . .

The Quality Control Plan (QCP) shall include the following:

      a) The offeror shall provide the number [of] years of experience as well as other pertinent documentation that the qualifications of the RRO who shall be responsible for performing the duties of the Quality Control Manager (QCM) and any additional Quality Control Inspectors (QCI's) meet the requirements of section 01-45-00.10-20, Quality Control, of the specifications.

    . . . .

      c) The offeror shall identify in their proposal the name of the inspection company that will perform the eight month [Infrared] Inspection of the new roof systems installed on post as a result of any subsequent award.  The requirements and qualifications for the [infrared] inspection company are listed in Section 01-45-00.10-20 Paragraph 1.11.1.b of the specifications.

      d) The offeror shall be able to provide a No-Dollar-Limit Warranty on applicable roofing systems.  The offeror shall provide a statement from the roofing system manufacturer(s) they intend to use attesting that the offeror can meet this requirement.

Id. at 659-60.  The Army also expanded the criteria for evaluating the Health and Safety Plan subfactor as follows:

The offeror shall provide an overview of their overall health and safety program, including training and documentation.  This overview shall provide sufficient detail as to clearly demonstrate a thorough working knowledge of the OSHA and EM-385-1-1 regulations and requirements that pertain to construction related activities.  Additionally, the overview shall provide a detailed working knowledge of the "means and methods" to be employed to show compliance with and adherence to the Occupational Safety and Health Administration (OSHA) and EM 385-1-1 safety requirements . . . .  Describe steps taken that promoted safety during contract performance within the last three (3) years.

The offeror shall provide written documentation in the form of correspondence on Insurance Carrier[] letterhead of a Worker's Compensation insurance Experience Modification Rate (EMR) of 1.00 or less for the previous five year operating period.  . . .

-12-

The offeror shall provide records of OSHA recordable injuries/illnesses (OSHA Form 300, 300A and 301) logs for the previous five (5) year period. . . .

The offeror shall provide the company's General Liability/completed operations insurance claims history for the past five (5) years.  This information shall be supplied on insurance company letterhead.  The total amount of valid claims paid by the insurer shall not exceed $1,000,000.00 for the previous five (5) year period nor shall valid claims for one (1) year exceed $350,000.00.

Provide documentation that the offeror has a Certified Safety Professional (CSP)[,] with a certificate awarded by the Board of Certified Safety Professionals (BCSP), on staff or has retained the services of a CSP awarded by the BCSP for the life of the contract to administer the Corporation[']s Health and Safety Plan programs.  A copy of the certificate of award for the CSP will be submitted as well.

The offeror shall provide resumes for the Certified Safety Professional (CSP) detailing the years of experience and licenses possessed by the CSP (both active and inactive).  The CSP SHALL have a minimum of five (5) years experience in the oversight of construction related safety programs and be fluent in English. The offeror shall have a minimum of five years of roofing construction experience as defined by the following features:

> a) Pneumatic nailer safety program development
> b) Ladder safety to include establishment of inspection
> c) Fall protection and prevention program development and implementation
> d) Pre-construction assessment and evaluation of potential hazards to include inspection of walking/working surfaces (from beneath and above)
> e) Assessment and prevention of injuries during roof removal operations
> f) Torch and asphalt kettle safety programs to include transfer piping and transportation of hot asphalt across roof
> g) Electrical safety to include working near overhead and adjacent electric power sources as well as electric power to roof mounted components
> h) Operation of powered lifting and hoisting equipment

The offeror shall provide a written health and safety plan . . . .  The plan shall be prepared by and signed by the Certified Safety professional and signed by the officers of the Corporation.

The offeror shall ensure that the following items are addressed in their Health and Safety Plan:

(a) What are the detailed control procedures for non-compliance [with] the company's safety and health requirements?  Who is responsible and who has the authority for identifying, stopping work, implementing corrections, documenting, recording and ensuring resolutions?

(b) What are the procedures for ensuring that the material condition of the equipment, both company owned and rented, that is to be used on this contract meets the requirements of the regulations as they relate to the operation of safety switches, safety overrides and visual/audible warning devices?  What steps are to be taken to ensure said devices are intact and operational?  What are the procedures for reporting faulty, unsafe or out of tolerance equipment to prevent its use on this contract?

(c) What are the offeror's drug and alcohol policies to include prevention programs as well as actions to be followed for employees with substance abuse issues?  How will these programs be applied to sub-contractors?

Id. at 660-61.

In contrast to expanding the evaluation criteria for the Technical subfactors, the Army significantly reduced its discussion of how it would evaluate the Past Performance factor to one sentence, providing that "an acceptable past performance rating [will be assigned if,] 'based on the offeror's performance record, the Government has a reasonable expectation that the offeror will successfully perform the required effort, or the offeror's performance record is unknown.'" Id. at 665.  And, the Army completely omitted any reference to evaluating price using the techniques described in FAR 15.404-1(b); it merely indicated that it would rank the offerors' proposed prices from lowest to highest.  Id. at 658.

The Army sent Amendment 7 to all of the offerors who submitted proposals in response to the solicitation–the [. . .] offerors who had been notified that they had been eliminated from the competition and plaintiff.  Id. at 667.  Two days later, on October 24, 2014, the Army issued Amendment 8, advising the offerors that revised proposals were due by 10:00 a.m. on November 3, 2014, and providing the offerors with its answers to questions submitted by the recipients of Amendment 7.  Id. at 666-69.  Of particular note was the following exchange:

1. Why is this amendment (#7) being sent to my company after we received an unsuccessful letter?

ANSWER #1:  Your Company is receiving this amendment because the Government has decided to clarify ambiguities that were in the original solicitation.  Since the technical portion was changed, all companies that provided a proposal are being given another opportunity.  The amendment has been issued to all the original companies that provided a proposal in response to the

-14-

solicitation.

The amendment only changed verbiage within the technical evaluation portion of the solicitation.

If your company does not meet the requirements set forth in the solicitation then you should not provide a revised proposal.

Id. at 667.  Finally, on October 28, 2014, the Army issued Amendment 9, which contained additional questions and answers.  Id. at 670-72.

### H.  Plaintiff's Protest in This Court

In response to the Army's decision to amend the solicitation and permit the offerors who had been excluded from the competition to submit revised proposals, plaintiff filed a bid protest in this court.  In its complaint, filed on November 4, 2014, plaintiff sets forth two claims for relief.  First, plaintiff contends that the Army unreasonably cancelled the contract that it awarded to plaintiff.  Compl. ¶¶ 69-74.  Second, plaintiff contends that the Army's decision to amend the solicitation and reopen the competition was arbitrary, capricious, an abuse of discretion, or contrary to law; plaintiff specifically asserts that in amending the solicitation, the Army improperly provided amendments to offerors eliminated from the competition in violation of FAR 15.206(c), allowed previously eliminated offerors to submit revised proposals in violation of FAR 15.307, and provided the other offerors with an unfair competitive advantage.  Id. ¶¶ 75-88.  Plaintiff accordingly seeks an injunction enjoining the Army from awarding the contract pursuant to Amendments 7 and 8, and an order requiring the Army to award the contract pursuant to the solicitation as it existed prior to the issuance of Amendments 7 and 8.  Id. at 17.

After filing its complaint, plaintiff moved for judgment on the administrative record on both of its claims for relief.  In response, defendant moved to dismiss plaintiff's second claim for relief, and for judgment on the administrative record on both of plaintiff's claims.  The parties have fully briefed their motions, and the court heard argument on February 3, 2015.

## II.  LEGAL STANDARDS

### A.  Motions to Dismiss

Defendant brings its motion to dismiss pursuant to Rule 12(b)(6) of the Rules of the United States Court of Federal Claims ("RCFC"), contending that with its second claim for relief, plaintiff has failed to state a claim upon which relief can be granted.  To survive such a motion, a plaintiff must include in its complaint "enough facts to state a claim to relief that is plausible on its face."  Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  In other words, a plaintiff must "plead[] factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged."  Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009)

(citing Bell Atl., 550 U.S. at 556).

## B. Motions for Judgment on the Administrative Record

Both parties have moved for judgment on the administrative record pursuant to RCFC 52.1.  In ruling on such motions, "the court asks whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence in the record."  A & D Fire Prot., Inc. v. United States, 72 Fed. Cl. 126, 131 (2006) (citing Bannum, Inc. v. United States, 404 F.3d 1346, 1356 (Fed. Cir. 2005)[9]).  Because the court makes "factual findings . . . from the record evidence," judgment on the administrative record "is properly understood as intending to provide for an expedited trial on the administrative record."  Bannum, 404 F.3d at 1356.

## C. Bid Protests

When entertaining a motion for judgment on the administrative record in a bid protest, the United States Court of Federal Claims ("Court of Federal Claims") reviews the challenged agency action pursuant to the standards set forth in 5 U.S.C. § 706.  28 U.S.C. § 1491(b)(4) (2012).  Although section 706 contains several standards, "the proper standard to be applied in bid protest cases is provided by 5 U.S.C. § 706(2)(A):  a reviewing court shall set aside the agency action if it is 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law.'"  Banknote Corp. of Am. v. United States, 365 F.3d 1345, 1350 (Fed. Cir. 2004).  Under this standard, the court "may set aside a procurement action if '(1) the procurement official's decision lacked a rational basis; or (2) the procurement procedure involved a violation of regulation or procedure.'"  Centech Grp., Inc. v. United States, 554 F.3d 1029, 1037 (Fed. Cir. 2009) (quoting Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332 (Fed. Cir. 2001)).

Procurement officials "are entitled to exercise discretion upon a broad range of issues confronting them in the procurement process."  Impresa, 238 F.3d at 1332 (internal quotation marks omitted).  Thus, when a protester challenges the procuring agency's decision as irrational, the court's review is "highly deferential" to the agency's decision, Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000), and "[t]he court is not empowered to substitute its judgment for that of the agency," Citizens to Preserve Overton Park, Inc. v. Volpe, 401 U.S. 402, 416 (1971).  "Accordingly, the test for reviewing courts is to determine whether the contracting agency provided a coherent and reasonable explanation of its exercise of discretion, and the disappointed bidder bears a heavy burden of showing that the award decision had no rational basis."  Impresa, 238 F.3d at 1332-33 (citation and internal quotation marks omitted); accord Advanced Data Concepts, 216 F.3d at 1058 ("The arbitrary and capricious standard . . . requires a reviewing court to sustain an agency action evincing rational reasoning

---

[9] The decision in Bannum was based upon then-RCFC 56.1, which was abrogated and replaced by RCFC 52.1.  RCFC 52.1 was designed to incorporate the decision in Bannum.  See RCFC 52.1, Rules Committee Note (June 20, 2006).

and consideration of relevant factors."). When a protester claims that the procuring agency's decision violates a statute, regulation, or procedure, it must show that the violation was "clear and prejudicial." Impresa, 238 F.3d at 1333 (internal quotation marks omitted).

## III.  PLAINTIFF'S SECOND CLAIM FOR RELIEF

### A.  The Waiver Rule Described in Blue & Gold Fleet Applies to Plaintiff's Second Claim for Relief

The court begins its analysis by addressing defendant's motion to dismiss plaintiff's second claim for relief.  The basis of defendant's motion is straightforward; according to defendant, under the rule described by the United States Court of Appeals for the Federal Circuit ("Federal Circuit") in Blue & Gold Fleet, L.P. v. United States, 492 F.3d 1308 (Fed. Cir. 2007), plaintiff waived its right to protest the Army's amendment of the solicitation by filing its complaint after the deadline for submitting revised proposals.  Plaintiff responds that the Federal Circuit limited the scope of this waiver rule in COMINT Systems Corp. v. United States, 700 F.3d 1377 (Fed. Cir. 2012), to permit challenges to the terms of a solicitation that are brought after the due date for proposals but before contract award.  Plaintiff also contends that the actions it took prior to the deadline for submitting revised proposals are sufficient to avoid the waiver of its claim.

In Blue & Gold Fleet, the Federal Circuit affirmed the conclusion of the Court of Federal Claims that the protestor's challenge to the terms of the solicitation, which was not raised until after the deadline for the submission of proposals, was untimely.  492 F.3d at 1312-16.  In doing so, the Federal Circuit recognized, for the first time, a waiver rule for bid protests, holding that

> a party who has the opportunity to object to the terms of a government solicitation
> containing a patent error and fails to do so prior to the close of the bidding process
> waives its ability to raise the same objection subsequently in a bid protest action
> in the Court of Federal Claims.

Id. at 1313; accord id. at 1315.  It found support for such a waiver rule in (1) the statutory mandate of 28 U.S.C. § 1491(b)(3) that courts are to "give due regard to . . . the need for expeditious resolution of" bid protests; (2) the fairness rationale underlying the doctrine of patent ambiguity; (3) the GAO's rule that challenges to the terms of a solicitation must be brought prior to the deadline for submitting bids or proposals; and (4) the analogous doctrines of laches and equitable estoppel in the patent context.  Id. at 1313-15.  Of these rationales for the recognition of a waiver rule, the Federal Circuit placed particular emphasis on fairness and the expeditious resolution of bid protests:

> In the absence of a waiver rule, a contractor with knowledge of a solicitation
> defect could choose to stay silent when submitting its first proposal.  If its first
> proposal loses to another bidder, the contractor could then come forward with the

-17-

defect to restart the bidding process, perhaps with increased knowledge of its competitors. A waiver rule thus prevents contractors from taking advantage of the government and other bidders, and avoids costly after-the-fact litigation.

Id. at 1314; see also id. at 1315 ("[T]he statutory mandate of [28 U.S.C.] § 1491(b)(3) for courts to 'give due regard to . . . the need for expeditious resolution of the action' and the rationale underlying the patent ambiguity doctrine favor recognition of a waiver rule."); DGR Assocs., Inc. v. United States, 690 F.3d 1335, 1343 (Fed. Cir. 2012) ("[I]f there is a patent, i.e., clear, error in a solicitation known to the bidder, the bidder cannot lie in the weeds hoping to get the contract, and then if it does not, blindside the agency about the error in a court suit.").

The Federal Circuit revisited the Blue & Gold Fleet waiver rule in COMINT Systems. In that case, the procuring agency amended the solicitation four months after the proposal submission deadline. 700 F.3d at 1380. More than two months later, it awarded three contracts pursuant to the amended solicitation. Id. The protestor objected to the terms of the amendment, but did not lodge a protest until after the procuring agency awarded the contract. Id. at 1380-81. Specifically, the protestor lodged a protest with the GAO almost two weeks after the contracts were awarded, and then, two months later, after the GAO denied its protest, filed a complaint with the Court of Federal Claims. Id. at 1380.

On review, the Federal Circuit agreed with the government that the protestor failed to preserve its challenge to the terms of the solicitation amendment by not raising it prior to the award of the contracts. Id. at 1381. Although it recognized that the Blue & Gold Fleet waiver rule was not directly applicable to the circumstances before it because the solicitation was amended after the proposal submission deadline, the Federal Circuit concluded that the reasoning of Blue & Gold Fleet "applie[d] to all situations in which the protesting party had the opportunity to challenge a solicitation before the award and failed to do so." Id. at 1382; see also id. (remarking that the rationales behind the Blue & Gold Fleet waiver rule–the need for fairness and the expeditious resolution of bid protests–supported the extension of the rule "to all pre-award situations"). Accordingly, it held that "assuming that there is adequate time in which to do so, a disappointed bidder must bring a challenge to a solicitation containing a patent error or ambiguity prior to the award of the contract." Id.

The Court of Federal Claims has addressed the decision in COMINT Systems in a handful of decisions. In Red River Communications, Inc. v. United States, the court considered whether the Blue & Gold Fleet waiver rule applied to protestors who did not, or could not, submit a bid or proposal. 109 Fed. Cl. 497, 506-11 (2013). In a footnote, the court distinguished COMINT Systems, remarking that the Federal Circuit in that case held that "when a solicitation is amended after the close of bidding and the amendment contains a patent error[,] . . . it is incumbent on the protestor to raise an objection to the amendment prior to contract award." Id. at 507 n.5. In other words, the court considered the rule announced in COMINT Systems to apply only in situations where the procuring agency amended the solicitation after the proposal submission deadline. The court reached the same conclusion in Advanced American

Construction, Inc. v. United States, noting that the Federal Circuit in COMINT Systems "held that when an alleged error in the procurement is not apparent until after the closing date for bidding, the protestor does not waive its arguments so long as it raised them before the contract is awarded." 111 Fed. Cl. 205, 220 (2013).

In two other decisions, however, the court interpreted the waiver rule described in COMINT Systems more broadly to allow a protest concerning the terms of a solicitation to be filed any time prior to contract award.  See Commc'n Constr. Servs. v. United States, 116 Fed. Cl. 233, 259 (2014) ("[T]he Federal Circuit extended the time a protestor may file a pre-award protest from the 'close of the bidding process' as articulated in Blue & Gold to any time before award is made."); Bannum, Inc. v. United States, 115 Fed. Cl. 257, 274 (2014) ("[U]nder COMINT, a protestor may raise a challenge to a solicitation any time prior to award–a time frame that may be beyond the close of the bidding process."); cf. Sotera Def. Solutions, Inc. v. United States, 118 Fed. Cl. 237, 253-54 (2014) ("The waiver rule in Blue & Gold Fleet has been extended in COMINT Systems . . . so that protests of the terms of an amendment to a solicitation are waived if not raised before award.").  However, it was not necessary for the court in those cases to apply its interpretation of COMINT Systems's waiver rule to the facts before it.  In Bannum, the court determined that the protestor objected to the terms of the solicitation prior to the deadline for the submission of proposals. 115 Fed. Cl. at 262, 273-74.  And in Communication Construction Services, the court concluded that the protestor waived its statutory and organizational-conflict-of-interest claims because despite knowing the basis of those claims prior to contract award, it did not raise them until after the procuring agency awarded the contract. 116 Fed. Cl. at 238, 260-61.  In neither case did the protestor attempt to challenge the terms of the solicitation after the proposal submission deadline, but before the procuring agency awarded the contract.  Thus, the courts' interpretation of the COMINT Systems waiver rule is dicta.

After a careful review of the Federal Circuit's decisions in Blue & Gold Fleet and COMINT Systems, the court concludes that the waiver rule articulated in COMINT Systems is limited to situations where the solicitation was amended after the proposal due date, and does not render timely every challenge to the terms of a solicitation lodged prior to contract award.  As stated in Blue & Gold Fleet and reinforced in COMINT Systems, one of the primary purposes of the waiver rule is to encourage the expeditious resolution of bid protests. 700 F.3d at 1382-83; 492 F.3d at 1313-15.  This purpose would not be served if a protestor could wait until after its proposal was due to challenge the terms of the solicitation.  In such circumstances, the procuring agency might have expended significant resources in evaluating proposals, and if discussions were held, both the procuring agency and other offerors would have incurred additional expenses.  Thus, as stated in Red River Communications and Advanced American Construction, the rule set forth in COMINT Systems may be invoked only if the solicitation terms to be challenged were added to the solicitation after the proposal submission deadline.

In this case, the principal amendments challenged by plaintiff–Amendments 7 and 8–were issued after the original deadline for submitting proposals.  If the Army had not invited revised

proposals and set a deadline for their submission in Amendments 7 and 8, then under the rule described in <u>COMINT Systems</u>, plaintiff may have been able to challenge the terms of those amendments at any time prior to contract award. However, the Army did set a new proposal submission deadline. Thus, plaintiff is bound by the <u>Blue & Gold Fleet</u> waiver rule, which requires a party seeking to challenge the terms of a solicitation to file its protest before the proposal submission deadline if it has the opportunity to do so. Plaintiff had such an opportunity, and therefore should have filed its protest before the deadline for submitting revised proposals–10:00 a.m. on November 3, 2014.

## B. Plaintiff Has Waived Its Second Claim for Relief

Plaintiff, of course, did not file its protest in this court until November 4, 2014. It argues, however, that its protest is timely because it preserved its claims by lodging a protest with the GAO. Plaintiff's contention, although facially appealing, is ultimately not persuasive.

Under the waiver rule articulated in <u>Blue & Gold Fleet</u>, a party is required to "object to the terms of a government solicitation . . . prior to the close of the bidding process" to avoid waiving "its ability to raise the same objection subsequently in a bid protest action in the Court of Federal Claims." 492 F.3d at 1313. Under the plain language of the rule, the objection need not be filed in a complaint filed in the Court of Federal Claims. All that <u>Blue & Gold Fleet</u> requires is that a protestor "do something before the closing date to preserve its rights . . . ." <u>DGR Assocs., Inc. v. United States</u>, 94 Fed. Cl. 189, 203 (2010), <u>rev'd on other grounds</u>, 690 F.3d at 1335. As a result, the Court of Federal Claims has concluded that a party will avoid the consequences of the waiver rule by lodging an agency-level protest or by filing a protest with the GAO. <u>See Bannum</u>, 115 Fed. Cl. at 274 ("At present, the law does not require that [the protestor] do anything more than [advising the contracting officer by letter that it objected to the terms of the solicitation]. All that is required is that a protestor must have 'done something' to challenge a solicitation prior to award to preserve its right to protest the solicitation in this Court."); <u>Advanced Am. Constr.</u>, 111 Fed. Cl. at 219 ("The Federal Circuit did not hold . . . that a protestor must always file suit in this court before the closing date for the receipt of bids to avoid waiving its claims. . . . [A]s a general rule, a party may preserve its rights by filing a protest with the agency or GAO, instead of this court, before the closing date for bidding."); <u>cf. Red River Commc'ns</u>, 109 Fed. Cl. at 510-11 (remarking that sending a letter to a congressional representative would not be sufficient to avoid waiver because such a letter would not afford "the procuring agency an adequate opportunity to address potential errors in a solicitation").

Here, plaintiff filed a protest with the GAO on June 30, 2014, challenging what it believed was the Army's cancellation of the solicitation. Plaintiff slightly broadened its challenge in its July 11, 2014 opposition to the Army's motion for summary dismissal; it argued that to the extent that the Army would be amending, rather than cancelling, the solicitation, such action was also improper because the Army had not demonstrated that an amendment was warranted due to a change in "requirements or terms and conditions" as required by FAR 15.206(a). Upon reviewing all of plaintiff's submissions to the GAO, the court concludes that

plaintiff sought to challenge at the GAO the Army's supposed cancellation of the contract award, the Army's purported cancellation of the solicitation, and/or the Army's allegedly unsupported decision to amend the solicitation.

However, when plaintiff lodged its protest at the GAO, the Army had not yet amended or cancelled the solicitation. Indeed, the Army did not take any action before plaintiff's GAO protest concluded with the GAO's September 25, 2014 denial of plaintiff's request for reconsideration. Rather, it was not until October 22, 2014, that the Army amended the solicitation by issuing Amendment 7. Because plaintiff's GAO protest predated Amendment 7, it cannot logically be understood to constitute a challenge to that amendment. Moreover, plaintiff's GAO protest would not have put the Army on notice of plaintiff's specific concerns with Amendments 7 and 8 such that the Army could address them prior to the deadline for submitting revised proposals. See, e.g., DGR Assocs., 690 F.3d at 1343 (noting that a protestor should not "blindside" a procuring agency with its bid protest complaint); Bannum, 115 Fed. Cl. at 274 ("The point of the waiver rule is to provide notice to the agency so that it can remedy a defective solicitation before award."); Red River Commc'ns, 109 Fed. Cl. at 509-10 ("[T]he waiver rule permits the Government an opportunity to address potential defects in a solicitation at an early stage in the procurement process, thereby avoiding wasted procurement efforts."), 510-11 (emphasizing that a protestor must raise an objection in a manner that allows a procuring agency to address the potential error in the solicitation). In its GAO protest, plaintiff advanced the general complaint that amending the solicitation was improper because the Army had not established that an amendment was necessary pursuant to 15.206(a). Plaintiff raises completely different claims in its complaint here–that the Army (1) provided the amendments to offerors eliminated from the competition in violation of FAR 15.206(c); (2) allowed previously excluded offerors to submit revised proposals in violation of FAR 15.307; and (3) provided the other offerors with an unfair competitive advantage. The Army had no notice of these claims before the deadline for submitting revised proposals. Therefore, plaintiff has waived its second claim for relief.

## IV. PLAINTIFF'S FIRST CLAIM FOR RELIEF

Plaintiff's remaining claim is that the Army unreasonably cancelled the contract it awarded to plaintiff. Plaintiff cannot pursue this claim unless it first establishes the existence of a contract with the Army. Generally, a contract with the federal government must meet the following requirements: "mutual intent to contract including an offer and acceptance, consideration, and a Government representative who had actual authority to bind the Government." Trauma Serv. Grp. v. United States, 104 F.3d 1321, 1326 (Fed. Cir. 1997). Here, plaintiff argues that there was a written offer and an unambiguous oral acceptance,[10] and that the

_____

[10] Plaintiff contends that the unambiguous oral acceptance was followed by written confirmation via electronic mail, but no such electronic-mail messages are contained in the administrative record.

-21-

contracting officer–Ms. Edwards–was authorized to bind the Army.[11]  Defendant responds that there was no binding contract between plaintiff and the Army because the contract for this procurement was required to be in writing, and the parties had, at most, an oral agreement. Defendant is correct.

The circumstances in this case are remarkably similar to those presented in American General Leasing, Inc. v. United States, 587 F.2d 54 (Ct. Cl. 1978), a decision cited by neither party.  In American General Leasing, the procuring agency determined that one proposal, submitted by Infodyne Systems Corp. ("Infodyne"), was technically superior to the other submitted proposals.  Id. at 56.  It subsequently met with Infodyne to negotiate certain changes to Infodyne's proposal.  Id.  Immediately after the parties agreed to various changes (which were memorialized by Infodyne in a letter that it sent to the procuring agency), the contracting officer advised Infodyne that he would issue "a letter of intent evidencing [the procuring agency's] commitment to the agreement" three days later.  Id.  However, the contracting officer did not issue the letter of intent, and the procuring agency formally cancelled the solicitation.  Id.  In its bid protest complaint, Infodyne argued that "the parties had entered into a binding express oral contract that was enforceable against the Government."  Id.  Defendant disagreed, arguing that no binding contract existed because "the parties contemplated a formal written agreement that was never executed."  Id. at 56-57.

In its decision, the United States Court of Claims ("Court of Claims"), the Federal Circuit's predecessor, noted that the solicitation at issue contained the following provision:  "A written award (or Acceptance of Offer) mailed (or otherwise furnished) to the successful offeror within the time for acceptance specified in the offer shall be deemed to result in a binding contract without further action by either party."  Id. at 57.  It further remarked that the relevant procurement regulations contained the following definition:  "'Contract' means establishment of a binding legal relation . . . .  It includes all types of commitments which obligate the Government to an expenditure of funds and which except as otherwise authorized are in writing." Id.  Finally, the Court of Claims indicated that the letter that Infodyne sent to the government reflected that there were "two prerequisites necessary in order to bind the parties contractually . . . , neither of which occurred."  Id.  Based on these facts, the Court of Claims held that the parties intended, and the procurement regulations required, the contract to be in writing.  See id. at 58 ("[I]t is clear, in addition to other manifestations of the parties' intent, that applicable procurement regulations . . . require Government contracts to be in writing in order to be binding upon the parties."); accord id. ("[T]he parties envisioned a formal writing as the only document which could establish a binding contractual relationship between them.  A written award pursuant to the solicitation was never furnished to the plaintiffs.  Unless such award was issued, no contract existed." (citation omitted)).

---

[11]  Plaintiff does not attempt to establish the fourth element of a government contract–consideration.  However, plaintiff's failure to address the consideration requirement is irrelevant given the court's disposition of plaintiff's claim.

In this case, the solicitation contains two provisions relevant to the nature of the contract contemplated by the parties.  One provision–nearly identical to the one quoted by the Court of Claims in American General Leasing–stated:  "A written award or acceptance of proposal mailed or otherwise furnished to the successful offeror within the time specified in the proposal shall result in a binding contract without further action by either party."  AR 127 (incorporating FAR 52.215-1(f)(10)).  The other provision sets forth a prerequisite to the existence of a binding contract:  "This contract is subject to the written approval of U.S. Army Contracting Command–Aberdeen Proving Ground (ACC-APG) and shall not be binding until so approved." Id. at 142 (incorporating FAR 52.204-1).  These two solicitation provisions demonstrate that a written agreement was necessary to have a binding contract.  In addition, various statutes and regulations pertaining to government procurements indicate that a procurement contract must be in writing to bind the parties.  See 10 U.S.C. § 2305(b)(4)(C) (2012) ("The head of the agency shall award the contract by transmitting, in writing or by electronic means, notice of the award to such source . . . ."); FAR 2.101 ("'Contract' means a mutually binding legal relationship . . . .  It includes all types of commitments that obligate the Government to an expenditure of appropriated funds and that, except as otherwise authorized, are in writing."); FAR 15.504 ("The contracting officer shall award a contract to the successful offeror by furnishing the executed contract or other notice of the award to that offeror."); see also 31 U.S.C. § 1501(a)(1)(A) (2012) ("An amount shall be recorded as an obligation of the United States Government only when supported by documentary evidence of a binding agreement between an agency and another person . . . that is in writing, in a way and form, and for a purpose authorized by law[.]").

Thus, like the parties in American General Leasing, plaintiff and the Army contemplated that in the event that plaintiff was the successful offeror, the contract would need to be reduced to writing to be binding.  The terms of the solicitation, which plaintiff incorporated into its proposal, unambiguously require a written agreement as the final step to the creation of an enforceable contract.  And, federal procurement law also requires a written agreement–a requirement that plaintiff, as a company that contracts with the federal government, is charged with knowing.  See Am. Gen. Leasing, 587 F.2d at 58 ("[P]arties contracting with the Government are charged with having knowledge of the law governing the formation of such contracts.").

It appears from the administrative record that the only step remaining for the consummation of the contractual relationship between plaintiff and the Army was for the Army to provide plaintiff with an executed agreement.  The Army never took this final step to formalize its acceptance of plaintiff's proposal, preventing the creation of a binding contract. See id. ("The parties may have completed the negotiations that would have led to a contract, but they had not taken the final and essential step of actually executing an agreement."); see also Harbert/Lummus Agrifuels Projects v. United States, 142 F.3d 1429, 1433 (Fed. Cir. 1998) ("[A]gency procedures must be followed before a binding contract can be formed."); New Am. Shipbuilders v. United States, 871 F.2d 1077, 1080 (Fed. Cir. 1989) ("Oral assurances do not produce a contract implied-in-fact until all the steps have been taken that the agency procedure requires; until then, there is no intent to be bound.").  The lack of a binding contract between

plaintiff and the Army is fatal to plaintiff's claim that the Army cancelled the contract it awarded to plaintiff–a contract that does not exist cannot be cancelled. Consequently, plaintiff cannot prevail on its first claim for relief.

## V.  CONCLUSION

In denying plaintiff's bid protest, the court is not signaling its approval of the Army's conduct in this procurement. Problematically, the competition had already advanced through a number of stages before the Army decided that the evaluation criteria contained ambiguities. The Army had reviewed the submitted proposals, entertained and ultimately denied a protest, and provided at least one debriefing. All of these activities required the Army to review and apply the evaluation criteria set forth in the solicitation. However, during none of these reviews–performed by numerous individuals (Ms. Edwards, the SSEB, Lieutenant Colonel Draper, and Major Lewis)–did the Army identify and/or document any ambiguities. There is nothing in the administrative record that explains why it took so long for the Army to discern that the evaluation criteria contained ambiguities.

In addition, the evidence in the record strongly suggests that the Army was reluctant to award the contract to plaintiff even though plaintiff was the only qualified offeror. First, the SSEB determined that plaintiff submitted the only technically acceptable proposal in August 2013, but the Army did not formally exclude the [. . .] other offerors from the competition or initiate price negotiations with plaintiff until late March 2014. This seven-month delay in proceeding towards contract award is contrary to the Army's source selection plan, which provided for a one-month time period between proposal evaluation and contract award, and the administrative record lacks any explanation for the delay. Second, although plaintiff and the Army reached an agreement on price in late March 2014 and the Army denied the agency-level protest in early May 2014, the Army delayed sending plaintiff an executed contract, finally advising plaintiff in late June 2014 that such a contract would not be forthcoming. The administrative record does not indicate why the Army did not execute a contract with plaintiff immediately after the two parties had reached an agreement on the contract price (an agreement that occurred before the agency-level protest was lodged) or immediately after the Army denied the agency-level protest.

There is no doubt that the Army did not conduct this procurement in an efficient manner. Nevertheless, the court is compelled by binding precedent to deny plaintiff's bid protest. As explained in more detail above, the court concludes that plaintiff waived its second claim for relief by not challenging the Army's issuance of Amendments 7 and 8 to the solicitation prior to the deadline for revised proposals. It therefore **GRANTS** defendant's motion to dismiss and **DISMISSES** plaintiff's second claim for relief for failure to state a claim upon which relief can be granted. Further, the court concludes that plaintiff has not established the existence of a binding contract with the Army. It therefore **GRANTS** defendant's motion for judgment on the administrative record and **DENIES** plaintiff's first claim for relief. Plaintiff's motion for judgment on the administrative record is **DENIED** in its entirety and its complaint is

**DISMISSED**.  No costs.  The clerk shall enter judgment accordingly.

The court has filed this ruling under seal.  The parties shall confer to determine agreed-to proposed redactions.  Then, by **no later than Friday, February 13, 2015**, the parties shall file a joint status report indicating their agreement with the proposed redactions, **attaching a copy of those pages of the court's ruling containing proposed redactions, with all proposed redactions clearly indicated.**

**IT IS SO ORDERED.**

s/ Margaret M. Sweeney
MARGARET M. SWEENEY
Judge